**Robert Tenorio Torres**
1st Floor, D'Torres Bldg.,
P.O. Box 503758
Saipan, MP 96950

Tel: (670) 233-7859
Fax: (670) 233-5749
Attorney for Defendant Dai, Xiao Jun

# UNITED STATES DISTRICT COURT FOR THE
# NORTHERN MARIANA ISLANDS

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**Plaintiff,**<br><br>**vs.**<br><br>**DAI, XIAO JUN**<br><br>**Defendant.** | **Criminal Case No. 05-00022**<br><br><br>**DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO SUPPRESS** |

## MEMORANDUM OF POINTS AND AUTHORITIES

### Introduction

This suppression motion is brought to underscore the point that the Government must comport itself with well-established and fundamental constitutional principles under the Fourth Amendment protecting each citizen's right against unlawful search and seizure. When the Fourth Amendment principles and its protections are violated, the Exclusionary Rule should therefore be imposed.

## I. FACTUAL BACKGROUND

<u>The Events Preceding Entry into Mr. Dai's Apartment</u>

1. On June 29, 2005 a group of federal and local law enforcement agents assembled to conduct a controlled delivery of a package containing approximately 2.75 kilograms of suspected counterfeit Viagra[1].  This group included, among others, AGO Immigration Division Major Edward Cabrera and CNMI Customs TFA Agent Albert Palacios (this group will referred to henceforth individually by name and identified collectively as "the agents."

2. The agents conducted a surveillance of the package from its interception on June 12, 2005 in San Francisco, CA, through its arrival on Saipan, and up to its delivery on June 29, 2005 to the Golden Crown Market located in Navy Hill, Saipan[2]. The Golden Crown Market is a permitted Commercial Mail Receiving Agency (CMRA). *Id.* at ¶ 4. The package was addressed to Chen Jian. The box at the Crown Market, PMB 212, belongs to a Bai YAN but the Postal Form 1583 also shows that Dai Yan and Dai Xiao Jun are listed to receive mail at that address. *Id.* at ¶ 8.

---

[1] *See, Complaint*, Criminal Case No. CR 05-00022 at ¶ 1 (sworn declaration of Matthew Goward) which is attached herein and is fully incorporated by reference.

[2] Mr. Dai does not concede that the intercept in San Francisco was lawful and reserves his right to challenge that matter.  He is presently awaiting further discovery as to those facts at the present time.

3.   At about 4:55 pm Major Edward Cabrera, as part of the group of agents, saw a person he identified as Mr. Dai arrive at the Golden Crown Market riding a bicycle. *Id.* at ¶ 14.  Major Cabrera saw Mr. Dai leave the CMRA with the package. *Id.*  The agents followed Mr. Dai from the CMRA on Navy Hill going South and towards the Promenade in Western Garapan. *Id.*  The agents purportedly observed Mr. Dai enter the Liao Ti Tour agency located in the Promenade area. *Id.*

4.   When Mr. Dai was seen entering the Liao Ti Tour agency, that was the last time any of the agents, including Major Cabrera and Special Agent Matthew Goward, saw Mr. Dai prior to their entry into his apartment around 6 pm that evening.  The agents lost visual contact with Mr. Dai[3].  The agents rushed and entered the Liao Ti Tour agency a few minutes later, but they could not find Mr. Dai. *Id.*  They could not find Mr. Dai for some time thereafter.

5.   The declaration of Special Agent Goward, in the Complaint, states that when the agents entered the tour agency, they entered "to observe that he [Mr. Dai] had absconded through a secret door hidden behind a mirror in the rear of the business." *Id.*  It is unclear how the agents "observed" Mr. Dai abscond since they

---

[3] The agents were following Mr. Dai by vehicle.  Mr. Dai was riding a bicycle.  Vehicles are no longer able to enter the Promenade area of the *Paseo de Marianas* so that the agents had to park their vehicles and alight from their vehicles afoot to track a person who is riding a bicycle.

never saw him do so.   However, in his Report of Investigation. Special Agent Goward states only that the agents "surmised that he [Mr. Dai] had absconded through a secret door hidden behind a mirror in the rear of the business. *See attached*, Exhibit "A" at ¶ 5 (Report of Investigation by Special Agent Goward). In other words, the agents only guessed what happened.

6.  Not one member of this group of experienced agents thought to monitor the package which they were observing.  Indeed, despite an ample span of two weeks, sufficient to secure an anticipatory warrant to do so, there was no beeper, tracker or monitoring device placed inside the package to follow its movements. Despite knowledge of the identity of the  persons listed to receive mail at the CMRA, the agents did not secure an anticipatory warrant to include the possible residences of the persons listed on the postal form 1583 for Box  PMB 212 at Golden Crown Market including Dai, Xiao Jun (Mr. Dai) or their residences.

7.  No agent monitored the rear of the premises (of the tour agency) prior to Mr. Dai's entry into that establishment.  No agent was monitoring the area at the corner of Date Street and Coral Tree Avenue, directly across from the Dai Ichi Hotel.  No agent was monitoring what was subsequently discovered to be Mr. Dai's residence on the 3rd Floor above the Guang Zhou Restaurant.

8.  The agents did not know where Mr. Dai lived.  Major Cabrera knew Mr.

4

Dai by visual contact. He had secured information regarding Mr. Dai based on the preliminary investigation of the CMRA and Box PMB 212 before June 29th. However, none of the agents knew where Mr. Dai lived much less where he worked since they did not monitor the tour agency premises. No agent was there ahead of time to monitor the premises prior to Mr. Dai's arrival.

9. When the agents realized the gap in their surveillance net and when they could not find Mr. Dai inside the tour agency, they abandoned their covert surveillance. They entered the agency and proceeded to accost an employee of the agency, Ms. Huang Min Hui. The agents entered the agency, with guns drawn, and started asking Ms. Huang as to Mr. Dai's whereabouts. Ms. Huang was afraid and did not know who this band of agitated persons was looking for and only surmised, later, that they were police. *See attached*, Declaration of Huang Min Hui at ¶ 6 marked as Exhibit "B" and fully incorporated into this factual statement by reference.

## The Search for Mr. Dai (Whereabouts Unknown)

10. The agents forced Ms. Huang from the tour agency to compel her to assist them to find Mr. Dai. One female agent held Ms. Huang's arm with some force and began to interrogate her asking, in English, where was Mr. Dai's apartment. *Id.* at ¶ 8. Ms. Huang, under the control of the agents, pointed to the

alley leading to the rear of the premises (to Date Street).  With guns drawn, two

agents forced Ms. Huang from the tour agency, through the alley and to the back

area.  Ms. Huang was in between a male agent and the female agent who held her

arm.  When they arrived at the rear area, Ms. Huang saw more agents.  All of the

agents were very upset and yelling in loud voices.  *Id.* at ¶¶ 8 and 9.  The agents

did not know Ms. Huang nor did she know any of them prior to June 29th.

11.  Ms. Huang herself did not know where Mr. Dai live.  She only knew

the general direction.  More importantly, none of the agents knew where Mr. Dai

lived.  Ms. Huang did not know where Mr. Dai went.  Instead, the agents engaged

in a guessing game of looking for Mr. Dai through Ms. Huang.  The agents

forcibly took Ms. Huang by holding her arm, up the stairs of the apartment

complex.  At each floor and at each different unit door, the agents asked Ms.

Huang, "Is this the one? "  When they reached the third floor, the agents asked,

"This room?   When they reached the third floor, the agents then effected entry by

breaking into Apartment B-3, Mr. Dai's apartment, which he shared with his

girlfriend, Yang Sen Hua.

12.  In contrast to Ms. Huang's sworn declaration, Special Agent Goward

claimed stated that "the female subject directed agents to apartment B-3 located at

the top of the stairs."  *See,* Complaint at ¶ 15 Ms. Huang's declaration does not

support this claim if it is claimed that Ms. Huang is the person whom directed them to Mr. Dai's apartment B-3. Ms. Huang did not direct them there as she never saw Mr. Dai enter any apartment including apartment B-3. Further, no agent, including Agent Goward, stated in the Complaint or in the Report of Investigation, that Ms. Huang was a reliable informant whose information was reliable from prior occasions.

### The Entry into Mr. Dai's Apartment B-3

13. In his declaration in the Complaint Agent Goward claims that he "heard activity inside the apartment" and forced entry into Mr. Dai's residence to "preserve the evidence." *Id.* Yet, in his Report of Investigation, Agent Goward states that TFA Albert Palacios "observed a pair of shoes that were similar to the ones being worn by [Dai Xiao] Jun [or "Mr. Dai"] outside of the door. *See,* Exhibit "A" at ¶ 6. Agent Goward then states that he and Agent John Duenas were "aware that the package and DVD player had been opened and was inside apartment B-3[4]." They knocked and announced their presence.

14. Agent Goward claimed superior auditory powers because, from where he stood outside the apartment door, he "heard someone [unidentified and

---

[4] Agent Goward does not state in his report nor does he state in his complaint as to how he and Agent Duenas were aware that a) the package was inside apartment B-3; b) that the DVD player had been opened; or c) that the package had been opened.

unknown] moving around inside the apartment" in order to justify his entry. *Id.*
What that "someone" moving around inside was doing, or who that "someone"
was, appeared to be of no moment to Agent Goward before he sought entry. More
relevant, he never stated that he knew it was Mr. Dai inside the apartment.

15. At no time, however, were any of the agents close enough to Mr. Dai to
observe the type of shoes he wore. TFA Palacios, not Major Cabrera, claimed to
have known Mr. Dai's shoes. No one saw Mr. Dai enter the apartment much less
enter the apartment with the package.

16. The agents, including Special Agent Goward, TFA Albert Palacios and
SSA John Duenas, forcibly entered Mr. Dai's apartment. They did so without a
warrant. *See*, Report of Investigation at Exhibit "A" at ¶ ¶6 and 7.

17. The articulated basis for the agents' entry into Mr. Dai's apartment,
according to Special Agent Goward, was "to preserve the evidence from being
destroyed." *Id.* The agents did not know that apartment B-3 was Mr. Dai's
residence. The agents did not see Mr. Dai enter apartment B-3. The agents did
not know that the package was taken into apartment B-3. The agents did not see
the package taken into apartment B-3. The agents did not know who was moving
around inside apartment B-3. In fact, the agents did not know who, if anyone,
entered apartment B-3.

## The Warrantless Search of Mr. Dai's Apartment

18. After their forced warrantless entry into Mr. Dai's apartment, the agents conducted a warrantless search of the apartment. The articulated basis for the search, according to Special Agent Goward, was a "safety sweep" or security or protective sweep of Mr. Dai's apartment "for other subjects and dangerous weapons." *See,* Report of Investigation, Exhibit "A" at ¶ 7. Mr. Dai's apartment B-3 is a small two-bedroom apartment with a small living room area and an adjacent kitchen area. *See,* Attachment to Exhibit "C", Declaration of Dai, Xiao Jun (diagram of Mr. Dai's apartment).

19. According to Special Agent Goward, during the sweep he observed portions of the sham Viagra tablets "on the desk in the bedroom, along with labels marked Viagra, and prescription bottles on the bed." *Id.* The agents then examined Mr. Dai's hands for the "Clue" substance which had been applied to the package prior to its pick-up at the Golden Crown Market. *Id.* at ¶ 8.

20. In his Report of Investigation and in the Complaint, Special Agent Goward claims that, several hours after their forced entry into Mr. Dai's apartment, around 10 pm (2200 hours) on June 29, 2005, he obtained a court-authorized search warrant. *Id.* at ¶ 9. A copy of the search warrant is marked and attached as Exhibit "D" and incorporated by reference. According to Special

Agent Goward, it was after the search warrant was obtained, and pursuant to the search warrant, that the agents proceeded further with their search of Mr. Dai's apartment. Further, it was supposedly pursuant to the search warrant that TFA Albert Palacios found marijuana in the refrigerator in the kitchen. *Id.* at ¶ 10. According to Special Agent Goward, TFA Fejeran and SSA Duenas found prescription bottles labeled with Viagra in Mr. Dai's bedroom, again pursuant to the search warrant and after the warrant was secured.

21. However, in his declaration, submitted under penalty of perjury, Mr. Dai states in detail the true actions of the officers following their forced entry into his apartment prior to obtaining a search warrant. *See,* Exhibit "C". Mr. Dai states that around 6 pm on June 29, 2005, he was in his apartment and heard someone knocking. As he walked to the door and as he was about to open the door, someone kicked in the door. *Id.* at ¶ 6. After their entry, Mr. Dai states that the agents secured and handcuffed him on the living room floor. *Id.* at ¶ 8. The agents then started going into the bedrooms and searching through his private domain. The agents did so without Mr. Dai's consent to enter into his apartment and without permission to search.

22. After a few minutes on the floor, Mr. Dai was lifted up and and placed in a chair near the kitchen next to the refrigerator. *Id.* at ¶ 10. Throughout this

10

entire ordeal, Mr. Dai was never presented with any search warrant or order to enter or search his apartment. From where he was placed in the kitchen, Mr. Dai observed that the agents were searching around in his apartment and could hear them doing the same in his bedroom. Mr. Dai describes in detail, under oath, that the agents' actions after their forced entry were far different from the version submitted by Special Agent Goward as to the search of his apartment.

23. Soon after the forced entry by the agents, and during their purported "security sweep" for "other subjects and dangerous weapons" Mr. Dai saw a short-haired local guy, middle height, and a bit fat, walk up and open the small freezer in the kitchen next to the refrigerator. *Id.* at ¶ 10. On information and belief, this would have been TFA Albert Palacios. TFA Palacios opened the freezer near Mr. Dai and started to "pick things up in the freezer." There was no weapon, gun or knives in the freezer much less "other subjects" posing any threat. *Id.* There was no information that any weapons were hidden in the freezer.

24. Not content with a quick and cursory search for weapons or other persons during a "safety sweep", TFA Palacios went further. TFA Palacios opened the freezer, picked up packages, and started opening closed packages in the freezer. He reached in and opened a clear plastic bag. *Id.* at 13. After opening the clear plastic bag, TFA Palacios reached in and took out the object, which

11

was wrapped in a cloth sheet. He then went on to remove the sheet, which revealed a carton package. TFA Palacios then opened the carton package.

25. TFA Palacios never suspected a weapon to be within several layers of packaging to be accessible so as to pose a threat to anyone. TFA Palacios looked inside the closed carton package. At that point, Mr. Dai then heard him say "marijuana" in English. *Id.* at ¶ 13. Thereafter TFA Palacios closed the package and closed the freezer.

26. Through all this Mr. Dai personally and directly observed the actions of TFA Palacios in opening the packages in the freezer. Also, he could hear the agents moving around in his bedroom. The actions of TFA Palacios and the other agents in searching the freezer and areas of the apartment for a "security sweep," took place only a few minutes after Mr. Dai was placed in the chair next to the refrigerator– not around 10 pm when the search warrant was obtained.

27. Further, other agents were rifling through Mr. Dai's room and his girlfriend's room looking around as part of their "safety sweep." Despite the small size of the apartment and several agents inside conducting a cursory "safety sweep," the agents went further. Mr. Dai could hear them searching around looking into his closet and opening drawers and packages in the apartment. *Id.* at ¶ 14.

12

28. After several minutes of being present during the purported "safety sweep," Mr. Dai was taken away by the agents and taken to the Horiguchi Building in Garapan. He was not brought back to the apartment. He later learned that the agents obtained a search warrant around 10 pm to search his apartment. The Complaint and Indictment in this case then followed.

## II. THE FOURTH AMENDMENT PROTECTIONS GOVERNING WARRANTLESS SEARCHES AND THE APPLICATION OF THE EXCLUSIONARY RULE

Warrantless searches are per se unreasonable unless they fall into one of a few narrowly established and extremely limited exceptions.[5] The Fourth Amendment to the United States Constitution guarantees the "right of the people to be secure in their persons, houses, papers and belongings against unreasonable searches and seizure." U.S. CONST. Amend. IV, § 3.

In addition to these rights, moreover, the Commonwealth Constitution provides for a right of individual privacy that "shall not be infringed except upon a showing of compelling interest." N.M.I. Const. Art. I § 10 (1986). Given the protections afforded by Article I, section 10, CNMI courts have consistently recognized that the right of the people of the Commonwealth to be free from

---

[5] *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). The government bears the burden of demonstrating that a search conducted without a warrant falls within these " 'jealously {guarded} and carefully drawn' " exceptions to the warrant requirement. *State v. Hendrickson*, 129 Wn.2d 61, 70, 917 P.2d 563 (1996) (quoting *Arkansas v. Sanders*, 442 U.S. 753, 759, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979).

unreasonable search and seizure is "firmly grounded in the Commonwealth Constitution."[6]

Underlying these rulings is judicial recognition that the Commonwealth Constitution provides far greater protections against unreasonable search and seizure to CNMI residents than those afforded by the Fourth Amendment alone.[7] Accordingly, any statute or rule authorizing searches must be construed strictly against the government and in favor of the liberty of the citizen. And for good reason.

Commonwealth law mandates, moreover, that for the government to intrude upon the constitutionally protected right to privacy, "it must show that there is a 'public purpose' which advances the health, safety or welfare of the community."[8] When such a purpose exists, the government must further demonstrate that the public purpose advanced by the intrusion is compelling: that is, "that the intrusion was necessary and could not have been accomplished in any other less intrusive

---

[6] *CNMI v. Aldan*, App. No. 96-034 (N.M.I. Sup. Ct. Dec. 4, 1997).

[7] *See CNMI v. Aldan,* Appeal No. 96-034, Slip Op. at 3-4 (N.M.I. Sup. Ct. Dec. 1,1997); *Babauta v. Superior Court,* 4 N.M.I. 309, 314 (recognizing that Article I, § 3 provides greater protections to CNMI residents than the Fourth Amendment in electronic surveillance case); *Commonwealth v. Hong Fan Li,* Crim. No. 00-0224 (N.M.I. Super. Ct. Jan. 4, 2001), Slip Op. at 2; *CNMI v. Dado,* Crim. Case No. 98-0261, Slip Op. at 20-23 (Super. Ct. Feb. 23, 2000)(Article I,§ 3 and Article I, § 10 provide greater protection against unreasonable search and seizure than that guaranteed by the Fourth Amendment; "unique characteristics of the Commonwealth require a strict reading of its search and seizure provisions and ... these provisions provide greater protection than that guaranteed by the Fourth Amendment"); *CNMI v. Sablan,* Crim. Case No. 94-35F (Super.Ct. Nov. 1, 1994) (Article I, § 3 provides greater protection against unreasonable search and seizure than that guaranteed by the Fourth Amendment).

[8] *Dado,* Slip Op. at 18 (Super. Ct. Feb. 23, 2000), citing Constitutional Convention of the Northern Mariana Islands, ANALYSIS OF THE CONSTITUTION OF THE COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS (Dec. 6, 1976) (hereinafter, "Constitutional Analysis") at 30.

way."[9] Although both the Federal and Commonwealth Constitutions prohibit only

unreasonable searches and seizures,[10] in the Commonwealth, what is "reasonable"

not thus only depends upon all of the circumstances surrounding the search and

seizure and the nature of the search and seizure itself,"[11] but on the more

expansive protections guaranteed to CNMI residents by guaranteed by Article I.[12]

With respect to a person's home, the Fourth Amendment draws a "firm line

at the entrance to the house. Absent exigent circumstances, that threshold may not

reasonably be crossed without a warrant." *Payton v. New York,* 445 U.S. 573, 590

(1980); *see also, United States v. Alaimalo*, 313 F.3d 1188, 1193 (9th Cir. 2003);

*Bailey v. Newland*, 263 F.3d 1022, 1029-1030 (9th Cir. 2001). A search occurs

"when an expectation of privacy that society is prepared to consider reasonable is

infringed." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). A person has an

expectation of privacy as a tenant in an apartment or rooming house. *McDonald v.*

---

[9] *Id.*

[10] *Dado,* Slip Op. at 18, citing *Harris v. United States*, 331 U.S. 145, 150, 67 S.Ct. 1098, 1101, 91 L.Ed.1399 (1947).

[11] *Dado,* Order at 18, quoting *United States v. Montoya de Hernandez*, 473 U.S. 531, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985).

[12] *See Sirilan v. Castro*, 1 CR 1082, 1111 (Dist. Ct. 1984) ("When the circumstances of a case are such that the provisions of the U.S. Constitution as they have been interpreted by the United States Supreme Court do not reflect the values of the people of the Commonwealth, we will not hesitate to look to the Commonwealth's Constitution for the protections and guaranties placed therein by and for the people"); *see also Dado ,* Order at 20-23; *Commonwealth v. Sablan*, Crim. No. 94-0035, Order at 9 (prior reliance on federal precedent and federal constitutional provisions does not preclude taking a more expansive view of state constitutions).

*United States*, 335 U.S. 451, 456 (1948)[13].

The warrantless search of a private residence strikes at the heart of the Fourth Amendment's protections. The right of officers to thrust themselves into a home is . . . a grave concern, not only to the individual but to a society which chooses to dwell in reasonable security and freedom from surveillance. *United States v. Erickson,* 991 F.2d 529, 532 (9th Cir. 1993).

The exclusionary rule prohibits introduction into evidence of evidence seized during an unlawful search and of testimony concerning knowledge acquired during an unlawful search. *Murray v. United States*, 487 U.S. 533, 536 (1988). The government cannot violate the Fourth Amendment through its agents and use the fruits of such unlawful conduct to secure a conviction. *Walder v. United States*, 347 U.S. 62, 64-65 (1954). These methods are outlawed and convictions obtained by them are invalidated because "they encourage the kind of society that is obnoxious to free men." *Id.*

Courts are duty-bound to superintend the preservation of citizens' constitutional protections. Accordingly, when a search occurs without the authority of a constitutional statute or court rule correctly interpreted, application

---

[13] Further, common areas of a rooming house, where the public is not invited or had the right to come and go at will, are subject to the protections of the Fourth Amendment. *Brown v. United States*, 83 F.2d 383, 385 (3rd Cir. 1936).

of the exclusionary rule is to invoke the supervision of the trial courts and the

appellate courts over the Executive Branch. More importantly, warrantless

searches and seizures of evidence in residences are permitted when both probable

cause and exigent circumstances exist. *United States v. Tovar-Rico*, 61 F.3d 1529,

1534-35 (11th Cir. 1995). The government has the burden of proof of showing

probable cause and showing exigent circumstances. *Id.*

Probable cause means more than bare suspicion. For a search and seizure or

arrest, probable cause exists when police "know reasonably trustworthy

information sufficient to warrant a prudent person in believing that the accused

had committed or was committing an offense." *United States v. Butler*, 74 F.3d

916, 920-21 (9th Cir. 1996). The courts look at the totality of the circumstances in

determining whether probable cause exists for a search or seizure. *Id.*

### The First Applicable Exception to the Warrant Requirement: Exigent Circumstances To Wit: Prevention of Destruction of Evidence

Warrantless searches are subject only to a few specifically established and

well delineated exceptions. *Katz v. United States*, 389 U.S. 347, 357 (1967).

Even so, the exceptions to the warrant requirement "must be jealously and

carefully drawn." *United States v. Rosi*, 27 F.3d 409, 411 (9th Cir. 1994). Once

the defendant produces evidence that the search and seizure were warrantless, the

burden is on the government to show that a warrantless search falls within a

recognized exception to the warrant requirement[14]. *United States v. Wilson*, 36 F.3d 1298, 1302 (5th Cir. 1994); United *States v. Carbajal,* 956 F.2d 924, 930 (9th Cir. 1992).

One exception, based on exigent circumstances, is the officer's fear of destruction of evidence. *United States v. Rico*, 51 F.3d 495, 501 (5th Cir. 1995)(discussing the relevant factors in evaluating whether exigent circumstances exist as to fear of destruction of evidence). However if the danger of destruction was "created by the officers' investigative strategy" such conduct cannot justify a warrantless entry. *United States v. Johnson*, 12 F.3d 760, 764 (8th Cir. 1993). Mere speculation is not sufficient to show exigent circumstances. *United States v. Tarazon*, 989 F.2d 1045, 1049 (9th Cir. 1993)[15].

The Second Applicable Exception to the Warrant Requirement:
Conducting a "Security Sweep" or "Protective Sweep" of the Premises.

Another exception to the warrantless search is that made in conjunction with

---

[14] That burden includes a showing that the agents had an objectively reasonable belief that exigent circumstances existed at the time of their warrantless entry into the defendant's residence. *United States v. Robles,* 37 F.3d 1260, 1263 (7th Cir. 1994). Even though exigent circumstances may exist, "they do not relieve an officer of the need to have probable cause to enter the house." *Murdock v. Stout,* 54 F.3d 1437, 1441 (9th Cir. 1995). Moreover, a police-manufactured exigency is "an exception to an exception" where officers have deliberately created the exigent circumstances. *United States v. Rico*, 51 F.3d 495, 502 (5th Cir. 1995). For example, the commission of a serious felony alone does not justify a warrantless entry into a person's home without probable cause that the occupant is the suspect. *Mason v. Godinez*, 47 F.3d 852, 855 (7th Cir. 1995).

[15] The government must show exigent circumstances by "particularized evidence" and, this being a "heavy burden," can be satisfied "only by demonstrating specific and articulable factsto justify the finding of exigent circumstances. *LaLonde v. County of Riverside*, 204 F.3d 947, 954 (9th Cir. 2000).

an in-home arrest then the searching officer "possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Maryland v. Buie*, 494 U.S. 325, 337 (1990)[16]. A protective sweep, however, is quick and limited, to protect the safety of officer or others but is "narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *United States v. Hromada*, 49 F.3d 685, 690 (11th Cir. 1995). Moreover, a police-manufactured emergency, such as the officers' decision to abandon a covert surveillance and confront the suspect, will not justify or excuse a warrantless entry and subsequent protective sweep. *United States v. Rico, supra* at 503[17].

## III. ARGUMENT

A. <u>There Was No Probable Cause for The Agents to Enter the Stairway/Common Areas of Mr. Dai's Apartment nor Enter His Apartment</u>

The agents had no probable cause to enter the apartment complex stairway

---

[16] In *United States v. Reid*, 226 F.3d 1020, 1028 (9th Cir. 2000), the Ninth Circuit Court held a protective sweep was invalid for failure to meet the burden as to articulable facts to justify a warrantless search.

[17] *See also, United States v. Noushear*, 78 F.3d 1442, 1448 (9th Cir. 1996)(search of a box with business receipts in a closet during a protective sweep was impermissible). The protective sweep may last "no longer than it takes to complete the arrest and depart the premises. *Id. See also, United States v. Blue*, 78 F.3d 56, 60 (2nd Cir. 1996)(given small apartment size and since defendant was secured, search of interior of the bed was overbroad and impermissible); *United States v. Anderson*, 981 F.2d 1560, 1568 (10th Cir. 1992)(just because police cannot cover a residence does not support a reasonable believe that others are inside the residence justifying a warrantless entry).

and the common areas, including the third floor, of Mr. Dai's apartment complex. The agents had no probable cause to force entry into Mr. Dai's apartment.

No one saw Mr. Dai enter the apartment complex. No one saw him enter the apartment nor reach the third floor. In fact, the agents lost contact with the package and lost visual contact with Mr. Dai. They lost him. They did not know where Mr. Dai went because they had to coerce Ms. Huang into assisting them. *See,* Exhibit "B". As a result, the agents abandoned their covert surveillance, enlisting Ms. Huang to assist them locate their lost subject. Yet Ms. Huang was not a trustworthy or reliable source inasmuch as the agents did not know her nor had she provided reliable information previously.

Moreover, even with Ms. Huang's presence at the rear area on Date Street, they still could not determine Mr. Dai's whereabouts. Instead, the agents engaged in a random guessing game of "which door is the right one" with the agitated agents asking Ms. Huang, at the threshold of each apartment unit on each floor, "Is this the one?" *Id.* This scenario was a situation of the agents' own making in failing to use less intrusive measures which would have ensured Mr. Dai's constitutional rights. They did not do so.

As to Mr. Dai's unit on apartment unit B-3 this much is undisputed: no agent including TFA Palacios, Agents Goward and Duenas, and Major Cabrera,

ever saw Mr. Dai enter the apartment. In addition, no agent saw Mr. Dai enter the apartment with the package. On top of that, Ms. Huang herself never saw where Mr. Dai went. She was guessing as much as the agents were in trying to find Mr. Dai. Probable cause to knock or enter apartment B-3 did not exist on June 29, 2005. Speculation and a guessing event do not amount to probable cause– an articulable suspicion based on specific objective facts is the standard required.

Mr. Dai has met his burden of producing evidence establishing that he had a legitimate expectation of privacy in his residence to wit, his apartment unit. The complex was not open to the public. It is a private complex not open to the public. The complex consists of several individual apartments. Only tenants, such as Mr. Dai, would have the right to enter the stairway and remain in the common areas.

To emphasize the import of the foregoing facts, for over two weeks the government engaged in a calculated effort to initiate a controlled delivery. The agents investigated. The agents researched and obtained information. The agents had ample opportunity to secure an anticipatory warrant with clear conditions as to the anticipated delivery location of the contraband. Major Edward Cabrera and the other agents clearly knew the names of the persons listed to receive mail. Indeed, Major Cabrera was able to identify Mr. Dai when he saw him. Why not an anticipatory warrant to protect the investigation? This would have been a flexible

21

and less intrusive instrument but one which would have been based on probable cause. The agents failed to secure an anticipatory warrant which would have included any location to which the package was taken[18]. This was their investigative strategy which caused the abandonment of the covert surveillance in favor of a warrantless entry and search.

Apart from disregarding the wisdom of an anticipatory warrant, the agents had ample time and opportunity to install a tracking device or electronically monitor the package to establish probable cause to enter Mr. Dai's apartment on June 29, 2005. Again, a less intrusive instrument to establish probable cause. They didn't. Yet the agents had time to open the package and put in the "Clue" substance. *See,* Exhibit "A". They had time to prepare a controlled delivery. The agents had time to consult a pharmacist as to the purported difference between counterfeit and real Viagra. *Id.*; *see also,* Complaint.

The agents had ample time to investigate and determine the names of persons receiving mail at the Golden Crown Market. *Id.* Despite such ample time to prepare for the controlled delivery, these seasoned agents thought nothing of securing a less intrusive "bird dog" device to monitor the movements and

---

[18] *See, United States v. Ruddell,* 71 F.3d 331, 333 (9th Cir. 1995)(affidavit must show that the property sought is on a sure course to the destination targeted for the search so that a controlled delivery pursuant to a warrant is permissible); *see also, United States v. Bieri,* 21 F.3d 811 (8th Cir. 1994); *United States v. Ricciardelli,* 998 F.2d 8 (1st Cir. 1993).

whereabouts of the package. Had they done so, the agents would have had

probable cause at the doorway of Mr. Dai's apartment (without Ms. Huang's

assistance) for the device signals would have led them there. Again, this

instrument was designed to be less intrusive and one which would have had the

scrutiny of an impartial judicial officer. Lack of preparation cannot be rewarded

to justify an illegal entry entirely lacking in probable cause. Again, this

investigative strategy leading to the unlawful entry without probable cause was the

product of the agents' own decisions, rather than Mr. Dai's conduct.

Instead, the agents engaged in a pretextual justification for their warrantless

entry and search: exigent circumstances to prevent destruction of evidence. This

exigent circumstance, however, was the agents' own making and creation for what

they did not do as to an anticipatory warrant and a tracking device. The agents'

own investigative strategy or lack of foresight was the cause of the exigent

circumstances. Now the agents try and bootstrap a claim of exigent circumstances

to support an unlawful entry. The proffered justification is simple: it is the only

exception which comes remotely close as an exception to the warrant requirement.

Yet this excuse must fail.

For example, Agent Goward claims to have heard movement inside the

apartment. *Id.* The only salient point on this is that no one saw that person inside

the apartment to be Mr. Dai. TFA Palacios claims he recognized Mr. Dai's shoes

outside the apartment door. *Id.* Again, TFA Palacios did not see Mr. Dai enter the

apartment. Here on Saipan, just because you can recognize my shoes or my

zorries outside my door, it means I am inside my house? The import of this

backward logic is disingenuous. The same goes for Agent Goward's superior

auditory senses to hear, from outside a closed door, that Mr. Dai was inside.

The agents claim Ms. Huang directed them to Mr. Dai's apartment even

though she never saw him enter any apartment much less Apartment B-3. *See,*

Exhibit "B". These facts are used as justification for an entry based on exigent

circumstances– the destruction of evidence. Yet none of the agents knew who was

inside the apartment. Nor did Ms. Huang.

Fortunately, the case law is well-settled that such grounds for justification

are neither specific nor articulable amounting to probable cause under the totality

of the circumstances. The fact is, the danger of destruction was precisely "created

by the officers' investigative strategy' and such conduct cannot justify a

warrantless entry. *United States v. Johnson*, 12 F.3d 760, 764 (8th Cir. 1993).

They were speculating and guessing, asking Ms. Huang "Is this the one?" at each

unit door in the complex. The scenario was hardly comical: it was a fishing

expedition of constitutional proportions. Yet this is also clear: mere speculation

24

is not sufficient to show exigent circumstances.

For the foregoing reasons, the agents lacked probable cause to enter the apartment of Mr. Dai and thus the claimed exception to the warrant requirement fails. The exclusionary rule must be imposed.

B. The Protective Sweep of Mr. Dai's Apartment was Warrantless, Pretextual, Overbroad and Created by the Agents' Actions in Failing to Monitor the Package.

Mr. Dai asserts that the purported "protective sweep" by the agents following their warrantless entry was equally constitutionally flawed and deficient so as to justify the imposition of the exclusionary rule. Mr. Dai asserts that the claim by Special Agent Goward that the discovery of the contraband marijuana after the issuance of the search warrant around 10 pm on June 29, 2005 is simply not true. Rather, the agents conducted a security sweep which was unconstitutionally expansive, with TFA Palacios searching the freezer and finding the marijuana (among the other activities of the agents) prior to the issuance of a search warrant. *See*, Exhibit "C".

Mr. Dai's sworn declaration states that the agents conducted a protective sweep after their warrantless entry. *Id.* That search, however, was neither brief nor cursory. While he was seated in the apartment, Mr. Dai directly and personally observed TFA Palacios open a closed package in the freezer, going

25

through several layers, to discover the marijuana. *Id.* Mr. Dai also could hear

agents in his bedroom searching through closets and drawers, purportedly as part

of their "protective sweep."[19]

This security sweep was clearly done without and prior to the issuance of a

search warrant by the Court. On top of that, the protective search was not of the

"quick and limited" nature. Instead, the agents engaged in a detailed rifling and

exacting search including, among other things, the package in Mr. Dai's freezer

and the closets and drawers in his bedroom. *See,* Exhibit "C". This was

impermissible and overly broad.

In a recent decision, the Second Circuit Court of Appeals held a protective

sweep which followed consensual entry by police was overly broad. *United States

v. Gandia,* __ F.3d. __, 2005 WL 2277103 (2nd. Cir. Sept. 19, 2005). The Court in

that case reviewed the standards governing protective sweeps set forth in *United

States v. Buie, supra.* In doing so, the Court in *Gandia* described a *Buie*

protective sweep as "a quick and limited search of premises" that "is narrowly

confined to a cursory visual inspection of those places in which a person might be

---

[19] It is noted at this point that the agents may claim that the "plain view" doctrine operates to permit the admission of the evidence at trial as to items which were exposed or in plain view of the officers. It is noted, however, that Agent Goward asserted the protective sweep as the justification for the search and did not claim that the incriminating nature of the items as contraband was apparent from their plain view. Moreover, the package in the freezer, did not have its incriminating nature apparent on plain view given that TFA Palacios e had to peel through layers of packaging before stating "Marijuana" (after he searched in order to determine contraband).

hiding." *Id.* at 5. Unlike most warrantless searches, which focus on the immediate danger posed by a suspect, the court in *Gandia* said that a *Buie* protective sweep allows officers to stop a potential ambush by searching for unseen third parties[20]. *Id.*

Well, in the instant case what the agents did was exactly what the Second Circuit held to be impermissible in *Gandia* and should likewise be held impermissible in Mr. Dai's case. This Court must impose the exclusionary rule because the search of the freezer, the opening of the contents of the packages in the freezer, and the opening of closets and drawers all went beyond the narrow confines of a protective sweep. Clearly it was beyond the spirit of the decision in *Buie* for agents to search closets. It was also beyond the law.

Ultimately the agents claim, as they have no other basis for justification, that the search of the freezer only occurred after they obtained a search warrant from this court. But Mr. Dai's declaration establishes the incredulous and implausible nature of this statement. The agents clearly conducted a protective sweep as stated by Agent Goward, but they went too far. Exhibit "A". Mr. Dai's statement confirms that but goes on to detail the scope of that protective sweep. The fact is that a protective sweep occurred during which TFA Palacios and his

---

[20] Yet the Ninth Circuit Court has taken a somewhat limited view of the protective sweep as expressed in *United States v. Reid*, 226 F.3d 1020, 1027 (9th Cir.2000) (holding that a protective sweep was improper, in part because at the time of the search, the defendant, "was not under arrest"

colleagues conducted an overly broad search beyond the limits of *Buie*.  The

remedy for that misconduct is the imposition of the exclusionary rule.


## IV. CONCLUSION

In *Coolidge v. New Hampshire*, the United States Supreme Court cautioned

that the warrant requirement "is not an inconvenience to be somehow 'weighed'

against the claims of police efficiency.  It is, or should be, an important working

part of our machinery of government, operating as a matter of course to check the

'well-intentioned but mistakenly over-zealous executive officers who are a part of

any system of law enforcement." [21]   Our Constitution is not a road bump, it is a

wall of protection.  Our Commonwealth Constitution raises that wall higher.

Although a violation of Fed. R. Crim. P. 41 does not, in every case,

automatically require suppression,[22] the facts giving rise to this motion cry out

that suppression as the only remedy appropriate under the circumstances here.

The foregoing facts and the applicable case law require this Court to impose

the exclusionary rule.  The Fourth Amendment operates to ensure justice for both

parties in this case.  To do justice, as with the numerous cases in which the

---

[21]   403 U.S. 443, 481, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).

[22]   *United States v. Luk,* 859 F.2d 667 (9th Cir. 1988); *United States v. Vasser,* 648 F.2d 507, 510 (9th Cir.1980), *cert. denied,* 450 U.S. 928, 101 S.Ct. 1385, 67 L.Ed.2d 360 (1981)

exclusionary rule has been imposed for government transgressions, the same must be done in the instant case for violations of Mr. Dai's right against unlawful searches and seizures.

Respectfully submitted this 11th day of October, 2005

Robert T. Torres
Counsel for Defendant