Clerk
District Court

DEC 3 0 2005

For The Northern Mariana Islands
By_____
(Deputy Clerk)

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN MARIANA ISLANDS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>DAI, XIAO JUN,<br><br>Defendant. | Case No. CR-05-00022<br><br>**ORDER DENYING IN PART AND GRANTING IN PART DEFENDANT'S MOTION TO SUPPRESS** |

THIS MATTER came before the court on Thursday, December 15, 2005, for hearing of Defendant's motions to suppress evidence obtained from three searches and seizures. Plaintiff appeared by and through its attorney, Assistant U.S. Attorney Jamie D. Bowers; defendant appeared personally and by and through his attorney, Robert T. Torres.

Defendant is charged in a two count indictment for trafficking in counterfeit goods in violation of 18 U.S.C. § 2320, and unlawful possession of a controlled substance with intent to distribute in violation of 21 U.S.C. § 841(a)(1) and 841(b)(1)(B).

Defendant filed two motions to suppress under Federal Rule of Criminal Procedure 12(b)(3). Defendant based his motions on U.S. statute and regulation, the Fourth Amendment of the U.S. Constitution, and the Commonwealth of the Northern Mariana Islands ("Commonwealth" or "CNMI") Constitution. First, Defendant contends that the search of the intercepted parcel ("first search") violates 19 U.S.C. § 1582 and 19 C.F.R. § 145.2 and, therefore, the evidence obtained and the fruits of the evidence obtained from the first search must be excluded from the trial. Defendant also claims that the first search violated the Fourth Amendment of the U.S. Constitution and Article

1, § 3 and § 10 of the Commonwealth Constitution.

Second, Defendant contends that the warrantless search of his apartment ("second search") was an illegal search and seizure in violation of the Fourth Amendment to the U.S. Constitution and Article I, § 3 and § 10 of the Commonwealth Constitution on three separate bases: (1) it is tainted by the first search; (2) it does not fall within any exception to the search warrant requirement; and (3) the Government lacked the requisite probable cause and exigent circumstances for such a warrantless search.

Third, Defendant contends that the warrant authorizing the search of his apartment ("third search") was tainted as fruits of the alleged illegal second search.

The Government responds that Defendant's motion to suppress is untimely, that the first search did not violate any statute or regulation, and that the second search falls under the exigent circumstances exception to the warrant requirement. The Government also responds that even if the second search violated the warrant requirement of the Fourth Amendment, application of the exclusionary rule is not proper because the "independent source doctrine" applies.

THE COURT, having fully considered the written and oral arguments of the parties, hereby denies Defendant's motion to suppress the evidence from the first search, and grants Defendant's motion to suppress the evidence from the second search and the third search.

## I. BACKGROUND

This motion relates to three consecutive searches. The first search occurred in San Francisco, California at a Customs and Border Protection ("CBP") Mail Facility. The second search occurred without a warrant at Defendant's apartment. The third search, which occurred about four hours after the second search, was conducted with a warrant.

The court makes the following finding of facts based on the moving papers and the

//

//

evidentiary hearing.[1]

## A. Search of Intercepted Parcel in San Francisco

On June 12, 2005, a parcel in the form of a box ("Package") was intercepted at the CBP Mail Facility in San Francisco, California.[2] The package had been express mailed via the Chinese and United States government postal system from Zhu Jun in China. On the exterior of the Package is an EMS packaging sticker and pictures of a Kenuo DVD / VCD player with Chinese writing, similar to a box used by a manufacturer in packaging new DVD players for sale. It was addressed to Chen Jian, PMB 212, P.O. Box 10002, Saipan, MP 96950. Post Office Box 10002 belongs to a permitted Commercial Mail Receiving Agency known as BBB or Golden Crown Market. PMB is located inside the Golden Crown Market and belongs to a Bai Yan but lists Dai Yan and Defendant, Xiao Jun Dai, as authorized persons to receive mail at that address.

At the San Francisco CBP Mail Facility and without a warrant, CBP Officer F. Orozco performed an x-ray scan of the Package.[3] Based on the x-ray scan, CBP Officer Orozco noticed that there were pill-shaped items concealed inside a larger item similar to a DVD player. Again without a warrant, CBP Officer Orozco opened the Package and found a DVD player. CBP Officer Orozco then opened the DVD player and discovered about 2.75 kilograms of blue diamond-shaped pills imprinted with the word "pfizer" inside the DVD player.[4] FDA inspector Bobby Smith inspected the Package at the San Francisco CBP Mail Facility and observed that the pills were consistent with

---

[1] Because the parties mainly contest issues of fact relating to the validity of the search, the court held an evidentiary hearing. Whether an evidentiary hearing is appropriate rests in the reasoned discretion of the court. *United States v. Walczak*, 783 F.2d 852, 857 (9th Cir. 1986).

[2] All mail from China to the Commonwealth is routed to San Francisco before entering the Commonwealth.

[3] About seventy-five percent of all packages are scanned by x-ray.

[4] No evidence was provided by either side as to whether the DVD player was operable, i.e. whether or not the DVD player had been "gutted" to make room for the pills.

counterfeit Viagra pills that he had encountered on previous occasions.

When the pills where discovered, CBP officers notified Special Agent Michael Simpson from Immigration and Customs Enforcement ("ICE") in San Francisco, who took control of the Package and its contents. After removing the tablets and sending a portion of the pills to a local laboratory for testing, the Government forwarded the Package to ICE Resident Agent-in-Charge ("RAC") in Guam for reassembly and a controlled delivery.[5]

### B. Warrantless Search of Defendant's Apartment

On or around June 15, 2005, to prepare for a controlled delivery, ICE Special Agent Matthew Goward asked CNMI Department of Labor and Immigration Major Edward Cabrera to run a background check on Chen Jian, the addressee of the Package, and Xiao Jun Dai, a person authorized to receive mail at PMB 212. Major Cabrera conducted a search in the Labor and Immigration Identification and Documentation System ("LIIDS") and found no record for Chen Jian but found a record on Defendant, Xiao Jun Dai. The LIIDS record indicated that Defendant had been employed by Liao Ti Corporation since at least May 11, 2004. No witness indicated whether any officer ran a background check on Bai Yan, the owner of PMB 212, or Dai Yan, the other person authorized to receive mail at PMB 212.

Major Cabrera reported to Special Agent Goward that there was a LIIDS record forXiao Jun Dai but no LIIDS record for Chen Jian. Major Cabrera also told Special Agent Goward that sources connect Xiao Jun Dai to prostitution, illegal gambling and / or controlled substances. Major Cabrera also told Special Agent Goward that Xiao Jun Dai was living in western Garapan. Major Cabrera testified that he failed to tell Special Agent Goward that the LIIDS report indicated that Defendant was employed by Liao Ti Corporation. No officer attempted to locate the Liao Ti Corporation or

---

[5] No testimony or affidavit explained exactly how the Package was transported from San Francisco to Guam.

Xiao Jun Dai's residence.

On June 17, 2005, the ICE RAC in Guam received the Package. On June 29, 2005, the Package was prepared for a controlled delivery: "Clue spray," a substance that can be detected under ultraviolet light, was applied to the inside of the DVD player, M&Ms as sham Viagra pills were inserted inside the DVD player, and the Package was reconstructed to its approximate original appearance.

In its brief, but without a supporting affidavit, the Government claimed that the officers installed an electronic tracking device ("device") in the Package. Furthermore, while the Government, in its brief, only indicated that one electronic tracking device had been installed in the Package, during the evidentiary hearing Special Agent John Duenas of the U.S. Immigration and Customs Enforcement indicated that two electronic tracking devices had been installed in the Package. Several other officers indicated that they had been aware that electronic tracking devices were being used during the search. Accordingly, the court finds that two electronic tracking devices had been installed in the Package. One device, the Bird Dog, a directional frequency emitter, had the ability to indicate the general location of the tracking device, that is whether the device was to the front, back, left or right of the receiver. The other tracking device, model LBA-1, was the size of a credit card and could not emit a directional frequency. Both devices were configured to emit special frequencies when the DVD player was opened and when the device was in motion.

On June 29, 2005, the officers began the controlled delivery to the address on the Package, PMB 212, P.O. Box 10002, Saipan, MP 96950. At around noon, Postal Inspector Craig Hales placed the Package into P.O. Box 10002 located at the main post office in Saipan. Agent Hales conducted surveillance and observed who he thought was a Golden Crown Market representative come to the box and pick up the mail placed in P.O. Box 10002. Agent Hales observed the representative pick up the Package and place it in a beige Toyota van.

Officers conducting surveillance observed the van drive North on Beach Road toward Garapan and stop in front of the Golden Crown Market on Micro Beach Road. Officers observed the

Package being unloaded from the van and taken into the Golden Crown Market.

At around 5:55 p.m., Major Cabrera was positioned about 150 feet from the Golden Crown Market. At that time, he observed a person dressed in black riding a bicycle arrive at the Golden Crown Market. Unable to identify the person with the naked eye, Major Cabrera, with the aid of binoculars, identified the person by name as Defendant. Major Cabrera, however, was not able to notice the details of Defendant's attire, such as Defendant's shoes. Major Cabrera saw Defendant leaving the Golden Crown Market with the Package but did not follow Defendant. Other officers followed Defendant from the Golden Crown Market going south and towards the Promenade area in western Garapan.

Unable to drive into the Promenade area, Special Agent Duenas was dropped off a block away from Defendant. Although he lost sight of Defendant, Special Agent Duenas had caught up to Defendant right as Defendant entered the Liao Ti Tour Agency. An officer identified the bicycle parked in front of the Liao Ti Tour Agency as one similar to Defendant's bicycle. In addition, the Bird Dog, a directional frequency emitter, indicated that Defendant may have entered the tour agency. Because the device had not indicated that it had been opened, the officers assumed that the Package was still intact. With this belief, they waited outside of the Liao Ti Tour Agency.

After about fifteen minutes at around 6:10 p.m., the receiver indicated that the DVD player had been opened. At that time, the officers rushed into the Liao Ti Tour Agency, with guns drawn. The officers proceeded to question Ms. Huang Min Hui, an employee of the agency who was the only person present. Ms. Huang verified that the bicycle belonged to Defendant. Finding no other way out except the front door and a secret door hidden behind a mirror, the officers "surmised that [Defendant] had absconded through a secret door hidden behind a mirror in the rear of the business." Report of Investigation by Special Agent Goward, Exhibit A. No testimony suggests how or when any officer found the secret door or whether the mirror that was to hide the secret door was in place when an officer actually found the hidden door.

Not able to find Defendant, the officers continued to question Ms. Huang. Ms. Huang

indicated that Defendant lived in an apartment complex located in the alley at the rear of the Liao Ti Tour Agency. In Ms. Huang's affidavit, she stated under penalty of perjury that, with guns drawn, the officers forcibly led Ms. Huang to the three storey apartment complex located in the alley at the rear of the Liao Ti Tour Agency. Ms. Huang stated that despite telling the officers that she did not know which apartment in the complex was Defendant's apartment, at each floor and at each different unit door, the officers asked Ms. Huang, "Is this the one?" Each floor has two apartments.

An officer on the scene, Special Agent Duenas, testified in court that he was not aware of how Ms. Huang was brought to the apartment complex as he was already at the complex when she arrived. However, when Ms. Huang arrived, Special Agent Duenas asked her to identify the apartment that Defendant lived in. Ms. Huang answered that she did not know. Then, officers walked Ms. Huang to the second floor. Special Agent Duenas, while pointing to one of the two apartments on the second floor then asked, "This one or this one?" Ms. Huang responded that she did not know. Ms. Huang was escorted to the third floor. Special Agent Duenas asked again, "This one or this one?" Ms. Huang responded that she did not know. Then, based on Ms. Huang's body language, Special Agent Duenas believed that Defendant's apartment was B-3.

The court, weighing the affidavit against the testimony of the live witness, adopts Special Agent Duenas' construction of the facts. Special Agent Duenas had been working for five years in the U.S. Immigration and Customs Enforcement office in Guam. During that time he attended numerous training classes relating to the dynamics of body language. With such experience and the fact that it is well known that an officer such as Special Agent Duenas routinely interprets body language in the course of his duties, Special Agent Duenas had the knowledge and experience to interpret Ms. Huang's body language at that time. Furthermore, Special Agent Duenas' demeanor on the stand was relaxed and his testimony was consistent and believable.

The Government claims that while the officers were trying to determine which apartment was Defendant's apartment, Drug Enforcement Administration ("DEA") Task Force Agent ("TFA") Albert Palacios identified shoes left at the entrance to Apartment B-3 as those similar to the shoes

Defendant was wearing. However, when TFA Palacios testified in court, TFA Palacios denied

making such an identification. Furthermore, TFA Palacios testified that the only time that he could

have seen Defendant's shoes was when Defendant picked up the Package at the Golden Crown

Market. During that time, however, TFA Palacios did not have binoculars and could not see

Defendant's shoes. Furthermore, even Major Cabrera, who had binoculars, could not recall the type

of shoes Defendant was wearing at the time. In addition, TFA Palacios would not have been

physically present to identify the shoes before the officers gained entrance into Apartment B-3

because, according to his testimony, TFA Palacios did not arrive at Apartment B-3 until after the

officers gained entrance. Accordingly, the court finds that no such identification of the shoes was

made.[6]

Thereafter, an officer knocked on the apartment door and announced that they were law

enforcement officers. Special Agent Duenas testified that he heard Special Agent Goward say that he

heard shuffling noises from within the apartment.[7] The officers then forcibly entered the apartment.

Defendant did not give the officers consent to enter or search the apartment. Defendant was not

presented with a search warrant.

The Government's articulated basis for entering Defendant's apartment was "to preserve the

evidence from being destroyed." Report of Investigation by Special Agent Goward, Exhibit A.

However, the Government did not present to the court either by affidavit or live testimony any

evidence of what the Government believed would have been destroyed, i.e. whether they were

concerned that the DVD player would be put back together, whether Defendant would have washed

off the clue spray, whether it is possible to wash off the clue spray, and / or whether Defendant

would have flushed the M&Ms down the toilet.

---

[6] The Government stated that officers participating in the controlled delivery included an Albert
Palacios and Albert Taitano, which may have caused confusion. However, the Government did not
submit any evidence supporting this claim.

[7] No one testified as to how loud or what type of shuffling noise Special Agent Goward heard.

After the officers forced entry into Apartment B-3, the officers conducted a warrantless search of the apartment. Apartment B-3 is a small two-bedroom apartment with a small living room area and an adjacent kitchen area. The Government's articulated basis for the search, according to Special Agent Goward, was a safety sweep of the apartment "for other subjects or dangerous weapons." Report of Investigation by Special Agent Goward, Exhibit A.

During the warrantless search, Defendant was found in a bedroom and secured and handcuffed on the living room floor. An officer examined Defendant's hands with an ultraviolet light and discovered the presence of "Clue" spray. A few minutes later, Defendant was lifted up and placed in a chair near the kitchen and next to the refrigerator.

Special Agent Goward observed portions of what he identified as sham Viagra, *i.e.* M&Ms, tablets "on the desk in the bedroom, along with labels marked Viagra, and prescription bottles on the bed." Report of Investigation by Special Agent Goward, Exhibit A.

In his affidavit, Defendant stated under penalty of perjury that during the warrantless search and before a warrant was obtained, Defendant saw whom he believes to be TFA Palacios open the freezer, pick up items from the freezer, and open a clear plastic bag. TFA Palacios took out the object, which was covered in a cloth sheet, from the clear plastic bag. TFA Palacios removed the sheet, revealing a carton package. Then TFA Palacious opened the carton package. TFA Palacios said "marijuana" in English, closed the package, and returned the object to the freezer. However, in court TFA Palacios testified that he did not search the freezer until after the warrant was obtained. The court, considering TFA Palacios' credibility and demeanor on the stand and Defendant's statements made in his affidavit under penalty of perjury, finds that TFA Palacios did not search the freezer until after the warrant was obtained.

In his affidavit, Defendant also stated that he could hear officers opening closets and drawers and other smaller items in the apartment during the warrantless search. Special Agent Duenas, however, testified in court that the warrantless search was brief and confined to ensuring the officers' safety and that no officers searched through drawers or other smaller items in the

apartment. The court, considering the Special Agent Duenas' credibility and demeanor on the stand and Defendant's statements made in his affidavit under penalty of perjury, finds that neither TFA Palacios nor any other officer had searched the drawers or other smaller items until after the warrant was obtained.

Around twenty minutes after the warrantless search, Defendant and Ms. Huang were taken into custody. TFA Palacios, however, testified that Defendant was not taken into custody and brought to the district courthouse but, instead, that he himself supervised Defendant for the next three hours while the other officers were obtaining a warrant. This court finds otherwise. Many other officers and witnesses testified in court or by affidavit that Defendant was taken into custody. This includes Ms. Huang in her affidavit, Special Agent Goward in his affidavit supporting the search warrant, and Special Agent Duenas on the witness stand. The court, in considering the credibility of the witnesses and affiants along with the corroborating facts that indicate the reliability of the testimony and affidavit, finds that Defendant was taken into custody around twenty minutes after the officers forcibly entered the apartment.

### C. Third Search: Search with Warrant at Defendant's Apartment

Several hours after the initial entry into Apartment B-3, at approximately 10 p.m., Special Agent Goward obtained a court-authorized search warrant and searched the apartment. During that search, without Defendant present, the officers found prescription bottles labeled "Viagra" in Defendant's bedroom. Labels printed with Viagra information, Viagra fact sheets, and Viagra quality seals were also found in the bedroom. United States and Japanese currency was also found. TFA Palacios found a clear plastic bag in the freezer containing a green leafy substance wrapped in a cloth sheet.

//

//

//

## II. TIMELINESS OF MOTIONS

On July 13, 2005, Defendant pled not guilty to the charges against him. That same day, Defendant made a motion, which the court granted, for pretrial motions to be due by August 15, 2005. Order Setting Trial Date, No. 6 (July 13, 2005). On August 11, 2005, the parties entered into a stipulation requesting the court to schedule a waiver of speedy trial hearing "to allow Defendant to further assist counsel in preparation of the case, including reviewing additional discovery and considering pretrial motions, and for the parties to [make] further discussions toward pretrial resolution." Stipulated Motion to Reset Jury Trial Date and Set Hearing for Waiver of Speedy Trial Right, No. 10 (Aug. 11, 2005). The court, while a visiting judge was presiding, granted the motion to "allow the defense further time to review the evidence in preparation for trial." Order Granting Waiver of Speedy Trial and Amending Scheduling, No. 12 (August 12, 2005). Defendant filed his first motion to suppress on October 11, 2005 and his second motion to suppress on November 18, 2005.

Unless good cause is shown, failure to raise a timely pretrial motion constitutes a waiver of such defense or objection. *See* Fed. R. Crim. Pro 12(f) ("Failure by a party to raise defenses or objections or to make requests which must be made prior to trial . . . shall constitute waiver thereof, but the court for cause shown may grant relief from the waiver."). Under LCrR 12.1, "[t]he court upon motion and for good cause shown may extend the time for filing motions."

Considering the facts of this case, the court considers the August 11, 2005, Stipulated Motion as the appropriate motion extending the time for filing pretrial motions. In the order granting the Stipulated Motion, the court stated that "Defendant waived his right to speedy trial and moved to continue his trial date in order to allow for additional time to effectively prepare his case." Stipulated Motion to Reset Jury Trial Date and Set Hearing for Waiver of Speedy Trial Right at 1, No. 10 (Aug. 11, 2005). Neither Defendant nor the Government moved to set a cut-off date for pretrial motions. Furthermore, in granting the motion the court considered whether good cause existed to amend the scheduling: "The [c]ourt finds . . . that the ends of justice [is] served by allowing the

defense further time to review the evidence in preparation for trial." *Id.*

Accordingly, in the interest of justice, the court deems the waiver of speedy trial to have included a motion for an extension of time to file pretrial motions. The court finds Defendant's motions are timely.

### III. MOTION TO SUPPRESS GROUNDED ON STATUTE

Defendant claims that customs inspectors lack authority under 19 U.S.C. § 1582 and 19 C.F.R. § 145.1 to search international mail not destined for delivery within the customs territory of the United States, *i.e.* the Commonwealth.[8] Defendant continues that because the government officers went beyond their scope of authority, the court must suppress the evidence obtained from that violation. The Government responds that the customs inspectors had the requisite authority. Regardless of the alleged violation, however, the court may not adjudicate an issue for which it lacks jurisdiction. Accordingly, the court *sua sponte* questions its subject matter jurisdiction.

As an Article IV court, the jurisdiction of the District Court of the Northern Mariana Islands is defined by 48 U.S.C. § 1821, which authorizes the court to exercise jurisdiction equivalent to an Article III court. Moreover, section 402(a) of the Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America, 48 U.S.C. §1801 (1976) [hereinafter Covenant], states that "[t]he District Court of the Northern Mariana Islands will have the jurisdiction of a district court of the United States, except that in all causes arising under the Constitution, treaties or laws of the United States it will have jurisdiction regardless of the sum or value of the matter in controversy." Accordingly, like an Article III court, the District Court of the

---

[8] Section 603(a) of the Covenant provides: "The Northern Mariana Islands will not be included within the customs territory of the United States." 19 C.F.R. § 145.2(b), implemented under the authority created by 19 U.S.C. § 1582, states in relevant part: "All mail arriving from outside the Customs territory of the United States and all mail arriving from outside the U.S. Virgin Islands which is to be delivered within the U.S. Virgin Islands, is subject to Customs examination . . . ."

Northern Mariana Islands is also limited to the resolution of "cases or controversies." *See United States v. Virgin Islands*, 363 F.3d 276, 285 n.3 (3d Cir. 2004) (noting that the "case or controversy" requirement applies to the District Court of the Virgin Islands because, although it is an Article IV court, "it is authorized by [48 U.S.C. § 1612] to exercise jurisdiction equivalent to an Article III court.").

One requirement of a case or controversy is that Defendant must have standing to bring this motion to suppress evidence obtained from Search 1. Plaintiff has standing if (1) he has an actual injury, *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990), (2) caused by the illegal conduct of the Government, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992), (3) that is likely to be redressed if the requested relief is granted, *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000).

Here, the problem with Defendant's motion to suppress evidence obtained from Search 1 is that Defendant fails to meet the third prong, redressability. The redressability requirement is satisfied when Plaintiff shows a "'substantial likelihood' that the requested relief will remedy the alleged injury in fact." *Id.* (quoting *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 45 (1976). Here, the alleged injury in fact is the search of the Package in violation of § 1582 and § 145.2. Plaintiff contends that exclusion of the evidence and of the fruits of the evidence obtained from the alleged illegal search is substantially likely to remedy the alleged injury. However, the relief, i.e. suppression, is not available to him for the alleged injury.

"Absent a constitutional violation or a congressionally created remedy, violation of an agency regulation does not require suppression of evidence." *United States v. Ani*, 138 F.3d 390, 392 (9th Cir. 1998); *see United States v. Caceres*, 440 U.S. 741, 755 (1979). Thus, for the exclusionary rule to apply, Defendant must show that Congress, or at least the U.S. Customs Service "explicitly or implicitly provided exclusion as a remedy for a violation of [the] statute." *United States v. Thompson*, 936 F.2d 1249, 1251 (11th Cir. 1991). Defendant has not provided any proof of Congress's intent to create the exclusionary rule as a remedy for this alleged violation. In fact, the

Ninth Circuit in *Ani* deemed that "[t]here is nothing to indicate that Congress or the United States Customs Service intended the exclusionary rule to be a remedy for violation of 19 U.S.C. § 1582 or 19 C.F.R. § 145.1." 138 F.3d at 392.

Defendant asserts that the Ninth Circuit in *United States v. Whiting*, 781 F.2d 692, 696 (9th Cir. 1986), supports his assertion that the exclusionary rule applies if customs officers do not have authority to search mail arriving from outside the Customs territory of the United States (i.e. China) which is to be delivered *outside* the Customs territory of the United States (i.e. the Commonwealth). However, even if 19 C.F.R. § 145.2 does not give the customs officers this authority, the Ninth Circuit's opinion in *Whiting* does not support Defendant's contention that the exclusionary rule applies. In *Whiting*, the Ninth Circuit held that agents of the Office of Export Enforcement of the Department of Commerce do not have authority to conduct a border search and detain packages at the post office "because Customs has full authority to conduct warrantless border searches of outgoing packages . . . ." *Whiting*, 781 F.2d at 698 n.14.

The Ninth Circuit in *Whiting* based its decision on *United States v. Soto-Soto*, 598 F.2d 545, 550 (9th Cir. 1979), which expressly distinguished a violation of authority derived from the U.S. Constitution and statute, where the exclusionary rule applies, and a violation of authority derived from regulations, where the exclusionary rule does not apply. In both *Whiting* and *Soto-Soto*, the searching officers violated a statute that authorized only customs officers to search mail and so the exclusionary rule was applicable. *Whiting*, 781 F.2d at 698; *Soto-Soto*, 598 F.2d at 550. Here, however, there was a regulatory violation, *i.e.* 19 C.F.R. § 145.2, and not a statutory or constitutional violation.

Most importantly, the difference between *Whiting* and *Soto-Soto* and this case is that in those two cases, the search agents were agents of the Office of Export Enforcement of the Department of Commerce and FBI agents, respectively, and not customs officers. There has been a long history of express authority granted to customs officers to "stop, search, and examine, as well without as within their respective districts, any vehicle or person, on which he or they shall suspect there is

14

merchandise which is subject to duty, or shall have been introduced into the United States in any manner contrary to law." *Alexander v. United States*, 362 F.2d 379, 381 (9th Cir. 1966) (quoting 19 U.S.C. § 481).

> In conferring upon Customs officers such broad authority, circumscribed only by Constitutional limitations of the Fourth Amendment, the Congress has in effect declared that a search which would be 'unreasonable' within the meaning of the Fourth Amendment, if conducted by police officers in the ordinary case, would be a reasonable search if conducted by Customs officials in lawful pursuit of unlawful imports.

As such, only customs officers may perform border searches and border searches performed by non-customs officers or equivalent to non-custom officers are subject to the exclusionary rule.

There must be an "exceptional reason . . . to invoke the exclusionary rule." *United States v. Harrington*, 681 F.2d 612, 615 (9th Cir. 1982). This is not one of them. Accordingly, Defendant's motion to suppress based on the Government's violation of 19 U.S.C. § 1582 or 19 C.F.R. § 145.1 is denied.

## IV. MOTION TO SUPPRESS GROUNDED ON U.S. CONSTITUTION

Defendant moves the court to suppress the evidence and fruits of the evidence obtained from the first search, the second search, and the third search based on Fourth Amendment of the U.S. Constitution.

The Fourth Amendment of the U.S. Constitution applies to the Northern Mariana Islands through section 501(a) of the Covenant to Establish A Commonwealth of the Northern Mariana Islands in Political Union with the United States of America ("Covenant"), 48 U.S.C. § 1801. The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Accordingly, all government searches must be reasonable. *Id.*

The Government does not dispute that it conducted a search within the meaning of the Fourth Amendment. *See United States v. Jacobsen*, 466 U.S. 109, 113 (1984) ("A 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed."). Accordingly, the only issue in dispute is whether the searches were reasonable. If the court finds that the search was not reasonable, the court must, under *Weeks v. United States*, 232 U.S. 383, 398 (1914), suppress the illegally obtained evidence.

### A. First Search: Search of Intercepted Parcel in San Francisco, CA

Defendant claims that his Fourth Amendment rights were violated when CBP Officer F. Orozco scanned the Package by x-ray and then opened the Package. However, Fourth Amendment rights are personal and may not be vicariously asserted. *Rakas v. Illinois*, 439 U.S. 128, 133-34 (1978). "A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." *Rakas*, 439 U.S. at 134. Given the totality of the circumstances, "[Defendant] must have manifest[e]d a subjective expectation of privacy in the [object] searched, and [his] expectation must [have] been one that society would recognize as objectively reasonable." *United States v. Sarkisian*, 197 F.3d 966, 986 (9th Cir. 1999).

Generally, only the sender and the addressee have a privacy interest in a mailed parcel. *United States v. Hernandez*, 313 F.3d 1206, 1209 (9th Cir. 2002). Defendant, however, was neither the sender nor the addressee of the Package.

Defendant urges the court to adopt *United States v. Sheldon*, 351 F. Supp.2d 1040 (D. Haw. 2004) for the proposition that this case is a situation where Defendant has a protectable privacy interest in mail that was neither sent by or addressed to him. Regardless of whether a third party may have a protectable privacy interest in mail, Defendant has not articulated a basis for his privacy interest in the Package. Specifically, he has not claimed ownership of the DVD player or the

1 counterfeit Viagra pills that were inside the DVD player. Furthermore, Defendant has not claimed
2 that the addressee on the package, Chen Jian, is a fictitious name that he uses to receive mail.
3 Moreover, there was no indication in the facts that Defendant was the owner of the DVD player or
4 the counterfeit Viagra pills. Unlike in *Sheldon*, there was no indication that Defendant was not simply
5 the downstream purchaser rather than the owner of the counterfeit Viagra.

6      However, even if Defendant had standing to challenge the first search, the Government has
7 met its burden of proving that the warrantless search was reasonable. *See Katz v. United States*, 389
8 U.S. 347, 357 (1967) (A search conducted without a warrant is presumed unreasonable and it is the
9 Government's burden to prove that the warrantless search is reasonable.). Here, the Government
10 claims that the border search exception to the warrant requirement made it reasonable for it to search
11 the Package.

12      The United States Supreme Court has long held that a border search, for Fourth Amendment
13 purposes, need not take place at the actual physical border, but may also occur at its "functional
14 equivalent." *Almeida-Sanchez v. United States*, 413 U.S. 266, 273 (1973). Here, the search took place
15 at the CBP Mail Facility in San Francisco, California. The San Francisco CBP Mail Facility handles
16 all mail traveling from China to the Commonwealth. Therefore, the San Francisco CBP Mail Facility
17 is the "border" for purposes of the border search exception. *See United States v. Ramsey*, 431 U.S.
18 606, 609 n.2 (1977).

19      Under the border search exception to the warrant requirement, "[r]outine searches of the
20 persons and effects of entrants are not subject to any requirement of reasonable suspicion, probable
21 cause, or warrant . . . ." *United States v. Montoya de Hernandez*, 473 U.S. 531, 538 (1985). The Ninth
22 Circuit has held that the test applied to a border search of a vehicle is equally applicable to a search
23 by customs agents of incoming mail: "[T]he mere entry alone into the United States from a foreign
24 country is sufficient reason for a border search." *United States v. Barclift*, 514 F.2d 1073, 1075 (9th
25 Cir. 1975). Here, CBP Officer Orozco performed an x-ray scan of the Package. Seventy-five percent
26 of all packages processed at the San Francisco CBP Mail Facility are scanned by x-ray. Furthermore,

while an x-ray scan is a search for Fourth Amendment purposes, *United States v. Henry*, 615 F.2d 1223, 1227 (9th Cir. 1980), "[officers] may . . . use scientific methods, such as x-rays . . . to detect . . . materials in the mail that may pose a grave risk to society." *United States v. Gill*, 280 F.3d 923, 933 (9th Cir. 2002).

It is unnecessary, however, to determine whether the warrantless opening of the Package may be justified by mere suspicion or reasonable suspicion because the opening of the Package comported to the higher standard of reasonable suspicion. *See Ramsey*, 431 U.S. at 623-34 (holding that reasonable suspicion that the parcel contained contraband is sufficient to justify a warrantless opening of a parcel under the border search exception). Here, the x-ray scan revealed to CBP Officer Orozco that there were pill-shaped items concealed inside an item shaped like a DVD player. CBP Officer Orozco understood that concealing such items suggests illegal activity, especially considering that controlled substances in the shape of small pills are often smuggled in illegally. This gave CBP Officer Orozco reason to believe that laws were being violated, and, with that belief, he opened the Package.

Accordingly, the court DENIES Defendant's motion to suppress the evidence and fruits of the evidence obtained at the San Francisco CBP Mail Facility because the search does not violate the Fourth Amendment.

### B. Second Search: Warrantless Search of Defendant's Apartment

A search conducted without a warrant is presumed unreasonable. *Katz*, 389 U.S. at 357. In such a situation, it is the Government's burden to prove that the warrantless search is reasonable. Here, the Government claims that exigent circumstances (i.e. that the evidence sought was in imminent danger of destruction) made it reasonable for the Government to search defendant's apartment before obtaining a warrant. *See Kirk v. Louisiana*, 536 U.S. 635, 638 (2002) (entry of home unlawful unless both probable cause and exigent circumstances exist). For the Government to satisfy its burden by preponderance of the evidence, it has to prove that there was probable cause and that it

1    had a reasonable belief that exigent circumstances existed. *Kirk*, 536 U.S. at 638; *United States v.*

2    *Matlock*, 415 U.S. 164, 177 (1974).

3        Determining probable cause is a two prong test. First, the court must determine the events

4    leading up to the search. *Ornelas v. United States*, 517 U.S. 690, 695 (1996). Second, the court must

5    decide "whether these . . . facts, viewed from the standpoint of an objectively reasonable police

6    officer," amount to probable cause. *Id.* at 696.

7        Accordingly, the following facts are pertinent. When the officers followed Defendant from the

8    Golden Crown Market, where Defendant picked up the Package, to the Promenade area, where they

9    lost sight of Defendant, they knew that Defendant had possession of the Package. Although the

10   officers lost sight of Defendant in the Promenade area, Special Agent Duenas had caught up to

11   Defendant right as Defendant entered the Liao Ti Tour Agency. Furthermore, officers identified the

12   bicycle parked in front of the Liao Ti Tour Agency as one similar to Defendant's bicycle. Ms. Huang

13   confirmed that the bicycle belonged to Defendant. In addition, the Bird Dog, a directional frequency

14   emitter, indicated that Defendant may have entered the tour agency. However, the officers waited

15   outside the Liao Ti Tour Agency because they determined that the Package had not yet been opened.

16       However, once the officers believed the Package and the DVD player had been opened, they

17   entered the Liao Ti Tour Agency but did not find Defendant. Then, based on questions answered by

18   Ms. Huang and Ms. Huang's body language, Special Agent Duenas concluded that Defendant's

19   apartment was B-3. An officer knocked on the apartment door and announced that they were law

20   enforcement officers. After hearing noise on the other side, the officers forcibly entered and secured

21   the apartment.

22       The Government contends that these facts amount to probable cause. Probable cause, in this

23   context, is defined as "a fair probability that contraband or evidence of a crime will be found in a

24   particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). The court takes a " practical, common-

25   sense" approach in determining whether probable cause existed. *Id.* As the U.S. Supreme Court made

26   clear in *Gates*, "probable cause requires only a probability or substantial chance of criminal activity,

not an actual showing of such activity."*Id.* at 245 n.13. "In dealing with probable cause, . . . as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Id.* at 231 (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)).

Defendant contends that the Government lacked probable cause at the time of the warrantless search because Ms. Huang was not known to be a reliable informant. Specifically, Defendant claims that the officers did not know, at the time of the warrantless search, whether Ms. Huang had personal knowledge or was reliable. Defendant claims that the manner in which Ms. Huang was questioned suggests that the information would not be reliable.

The weight to be given to an informer's tips is considered in the totality-of-the-circumstances analysis of probable cause. *Gates*, 462 U.S. at 238. "[E]ven if an informant does not disclose the basis for his information, police corroboration or the surrounding circumstances can support a determination of the informant's reliability." *United States v. Tarazon*, 989 F.2d 1045, 1049 (9th Cir. 1993).

Here, Ms. Huang did not disclose the basis of her information. The Government did not ask Ms. Huang how she knew where Defendant lived. The Government did not claim that the officers were aware that Defendant worked at the Laio Ti Tour Agency. In fact, Major Cabrera testified that, although he was aware of it, he did not tell Special Agent Goward that the LIIDS report indicated that Defendant was employed by Liao Ti Corporation. No officer knew where Defendant lived. The only fact that corroborated Ms. Huang's information was the shuffling noise Special Agent Goward heard coming from behind the door. However, there was no testimony regarding what kind of noise was heard and how loud the noise was. For example, no testimony suggested that the noise sounded like running water or a flushing toilet. With no other corroborating facts besides the scuffling noise, no reasonable police officer would believe that B-3 was Defendant's apartment. *See Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (quoting *Ornelas*, 517 U.S. at 695 (stating that probable cause must be "viewed from the standpoint of an objectively reasonable police officer")).

Accordingly, the court GRANTS Defendant's motion to suppress evidence and fruits of the evidence obtained from the second search.

### C. Third Search: Search Authorized by Warrant

Defendant claims that the warrant authorizing the third search was tainted as fruits of the illegal second search. The Government responds that the warrant is not tainted by the second search and even if it was tainted, the application of the independent source doctrine, as an exception to the exclusionary rule, permits the Government to use evidence obtained from the third search.

"[T]he Fourth Amendment . . . has traditionally mandated a broad application of the 'fruits' doctrine." *Oregon v. Elstad*, 470 U.S. 298, 306 (1985). The fruits doctrine requires that the court apply the exclusionary rule "not only to the illegally obtained evidence itself, but also to other incriminating evidence derived from the primary evidence." *Nix v. Williams*, 467 U.S. 437, 441 (1984). However, "[t]he independent source exception to the exclusionary rule 'allows admission of evidence that has been discovered by means wholly independent of any constitutional violation.'" *Murray v. United States*, 487 U.S. 533, 544 (1988) (quoting *Nix*, 467 U.S. at 443). This means that "[w]hen an affidavit in support of a search warrant contains information which is in part unlawfully obtained, the validity of a warrant and search depends on whether the untainted information, considered by itself, establishes probable cause for the warrant to issue." *United States v. Alexander*, 761 F.2d 1294, 1300 (9th Cir. 1985) (quoting *James v. United States*, 418 F.2d 1150, 1151 (D.C. Cir. 1969)).

As stated above, probable cause, in this context, is defined as "a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). Here, the only facts in the affidavit that are not tainted by the illegal search that suggests that the officers had reason to connect Apartment B-3 to Defendant is contained in paragraph 27:

> A search of the area [of the Liao Ti Tour Agency] and questioning of a female subject in the Liao Ti business lead Special Agents to an apartment above the Guang Zhou

restaurant at the corner of Date [S]treet and Coral Tree [A]venue, directly across from the Dai Ichi hotel. The female subject directed agents to apartment B-3 located at the top of the stairs. Special Agents knocked on the door and announced their presence numerous times. Your affiant [Special Agent Goward] heard activity inside the apartment and in an effort to preserve the evidence forced entrance into the residence.

Like the court's determination above that the officers lacked probable cause for the second search, the court finds that after purging the tainted portion of the affidavit, there was no probable cause to issue the warrant. The most important information that ¶ 27 omits is the female subject's reliability and / or credibility. Paragraph 27 does not suggest any corroborating facts or facts supporting the female subject's personal knowledge to suggest that an objectively reasonable police officer" would find the female subject to be reliable. *Pringle*, 540 U.S. at 371.

Accordingly, the court GRANTS Defendant's motion to suppress the third search.

## V. CONCLUSION

FOR THE FOREGOING REASONS, the court DENIES Defendant's motion to suppress the first search, GRANTS Defendant's motion to suppress the second motion, and GRANTS Defendant's motion to suppress the third search. The court DENIES as moot Defendant's motion to suppress the second search and the third search based on violation of the Commonwealth Constitution.

DATED this 30th day of December, 2005.

_____
ALEX R. MUNSON
Judge

22